UNITED STATES, Appellee,

v.

**Darrold D. ELLIOTT, Airman First Class U.S. Air Force, Appellant.**

No. 46,478.
ACM 23703.

U.S. Court of Military Appeals.

Oct. 14, 1986.

*Captain Conrad C. Baldwin, Jr.* (argued); *Colonel Leo L. Sergi* (on brief); *Colonel George R. Stevens* and *Major Alexander S. Nicholas,* for appellant.

*Major Robert E. Ferencik, Jr.* (argued); *Colonel Kenneth R. Rengert* and *Colonel Andrew J. Adams, Jr.* (on brief), for appellee.

## Opinion of the Court

EVERETT, Chief Judge:

After a contested trial, a general court-martial with members convicted the accused of stealing two television sets—each being military property of the United States valued at more than $100—and wrongfully selling one of the sets, in violation of Articles 121 and 108, Uniform Code of Military Justice, 10 U.S.C. §§ 921 and 908, respectively. Thereafter, the court sentenced the accused to a dishonorable discharge, confinement for 18 months, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the trial results, except that he substituted a bad-conduct discharge for the dishonorable discharge adjudged; and the Court of Military Review affirmed.

This Court specified five issues for review (17 M.J. 194; 19 M.J. 258)—the first three concerning various evidentiary disputes during the trial on the merits; the fourth involving the testimony of the accused's commanding officer during the sentencing proceedings; and the last addressing treatment in the post-trial review of the question of the accused's rehabilitative potential. We will discuss all five issues, beginning with two related evidentiary issues which we conclude require that we set aside the findings and sentence.

I

On May 26, 1982, someone stole a Sears television set belonging to the Government out of a dormitory. Then, during the early-morning hours of May 27, an RCA television belonging to the Government was reported missing from another dormitory. The next day, the second set was found at a local pawn shop. The store's records indicated that the accused had sold it the day before for $100.

Technical Sergeant Johnnie Ravenell of the base security police squadron testified at trial that, after he had been briefed as to these events on Friday, May 28, he unsuccessfully tried to contact the accused. On Monday, May 31, Elliott voluntarily arrived at Ravenell's office. After the investigator had advised him of his rights under Article 31, UCMJ, 10 U.S.C. § 831, the accused explained that he had received the recovered television from a third person named "Guy," who simply had given it to him as a gift because he no longer had any use for it. Elliott had said that he seldom watched television, so Guy had told him that he could sell the set. After the accused denied having any other television sets, Ravenell requested and received Elliott's consent to search his off-base apartment. There Ravenell found the missing Sears television sitting on the living room floor.

He testified that Elliott had seemed genuinely surprised when they saw the TV. Back at Ravenell's office, Elliott indicated that the same person who had given him the RCA television also had given him the Sears set found in his living room.

The accused had described his benefactor as a blonde, mustached man in the base supply squadron whom he had met at his recent field-training school. He informed Ravenell that Guy's last name was something like "Moldriff" or "Muldriff"; that he drove a red, older-model pickup truck; and that he had told Elliott that he soon would be leaving for Korea. Ravenell testified that, despite his efforts through the base supply squadron, he was unable to locate such a man.

At the close of the Government's case-in-chief, trial counsel asked for an Article 39(a), 10 U.S.C. § 839(a) session[1] to litigate the admissibility of certain evidence which he anticipated that defense counsel would offer. This evidence was expected to come from three witnesses: Airman Rowe, a friend of the accused; Miss Laura Smythe, the accused's fiancee; and Sergeant Whitlow, another friend and a superior of the accused.

Airman Rowe and Miss Smythe would have given similar testimony, as was reflected in this offer of proof by defense counsel as to Airman Rowe:

> First of all, Airman Keith Rowe will testify that he has known Airman Elliott for quite some time and that they were roommates and friends. He will testify about a conversation that he had with Airman Elliott in mid-May of this year, a conversation about a television set. Airman Rowe will testify that Airman Elliott told him that he had met a guy at school who was going to give him a TV set. Airman Rowe will also testify that at a later date he went to Airman Elliott's house and saw a TV set sitting on the floor of the living room. He will testify that he later talked to Airman Elliott and mentioned that he saw a TV in the house and that Airman Elliott said,

"Yes, that's the TV that the guy gave me." He will also testify as to pertinent character traits of Airman Elliott, one character trait being the fact that—he would testify that Airman Elliott is a trusting person, that he trusts other people in general. He will also testify that he is an honest person.

After defense counsel had made this offer, trial counsel particularized his objections: First, the conversation Rowe had with the accused in mid-May about "this guy that he had met who was going to give him a TV, [either] is rank hearsay," offered to prove the truth of the matter asserted (that is, that a third party did give Elliott one or both television sets) or is offered as "a bolstering of the accused's testimony before he takes the stand even though it has not been attacked and before it has even had a chance to be attacked." Second, the conversation between Rowe and the accused after Rowe had seen the TV in Elliott's living room was objectionable on the same grounds. Finally, although testimony about the accused's honesty was not objectionable, evidence that he is trusting of other people was not relevant: "We don't see where that's an issue in this case and we would object to that."

Defense counsel responded that it was her position that evidence as to the two conversations (and as to two similar conversations with Miss Smythe) "is not hearsay and that we are not offering this evidence to prove the fact that the TV was actually given to Airman Elliott in the manner he stated, we are offering it to raise the issue and to establish the issue of mistake of fact on the part of Airman Elliott." Counsel continued:

> So the statements are being offered not to prove the truth of the matter asserted by Airman Elliott but, rather, to show the state of mind at the time, to show his intent, if you will, or his lack thereof.

As to evidence of Elliott's trusting nature, defense counsel explained that such evidence would address the issue of "did he

1. Article 39(a), Uniform Code of Military Justice, 10 U.S.C. § 839(a).

really believe that this man was giving him a TV that belonged to him; did he trust him? And that's exactly why it is pertinent to this case."

When asked what evidence could be expected from Sergeant Whitlow, defense counsel indicated that he would testify that, as a friend of the accused, he had told Elliott when they were in class together on the night of May 28, that the security police were looking for him and that, when told of this, Elliott's reaction was one of "curiosity." Defense counsel explained the relevance of this testimony as follows:

> [I]t is relevant to the issue of mistaken belief, if you will, or ignorance. If Airman Elliott had stolen TV's in his house and knew the Security Police were looking for him, his reaction might possibly have been something other than curiosity—more like fear.

Counsel continued:

> It [also] relates to the fact that the TV was still in his house. We are talking about the 28th of May that this conversation took place. The TV wasn't found in his house until the 1st of June. The fact that the TV wasn't removed from his house and—of course, this is more for argument, I suppose, than it would be—I am not going to question the witness about this—but the fact that the TV was still there, even though Airman Elliott knew that the police were looking for him on the 28th, tends to show that he didn't know that that was stolen property.

Finally, defense counsel indicated that Sergeant Whitlow would testify that the accused is a trusting and honest person. Of course, trial counsel objected to any testimony on the former of those traits on the same grounds upon which he had rested his objections to similar testimony by Rowe and Smythe.

After a short recess, the military judge returned with these rulings on the contested evidence:

> MJ: At this time, not knowing whether the accused is going to take the stand or not, it is the court's opinion that the testimony that is to be elicited both from Miss Smythe and France—Was that the other individual's name?
>
> TC: Rowe, sir.
>
> MJ: I'm sorry. Rowe. I've got "France." With regards to the conversations in mid-May regarding the individual who was supposed to give the accused a TV set and later discussions regarding the same individual who was going to give the accused a TV set are hearsay and, therefore, are not admissible. That's with regard basically to Rowe and Smythe. It is also the court's ruling that the character trait of the accused being a trusting person is also not admissible as a character trait under the Military Rules of Evidence—at least at this point anyway. So in effect I am stating that the government's objections at this point are sustained or will be sustained if that evidence is attempted to be elicited at this point.... If [the accused] takes the stand and he is cross-examined, then the statements could conceivably be prior consistent statements which might be admissible under 801 —I think it is (d)(2)—(d)(1)(B).
>
> DC: What is your ruling as to the testimony of Sgt Whitlow?
>
> MJ: I am sorry. With regards to his testimony, the same, obviously, would have to apply with regard to his opinion as to the trustworthiness of the— Not the trustworthiness, I'm sorry, but the trusting nature of the accused, but otherwise, he is free to testify as to the accused's reaction when he was advised of the fact that the Security Police were going to—wanted to see him. So you can inquire about that.

Later, the military judge clarified that his rulings on admissibility of evidence concerning the mid-May and late-May conversations with Rowe and Smythe extended to any testimony of the accused, as well, concerning these conversations.

### A. *Appellant's Trusting Nature*

Mil.R.Evid. 404(a), Manual for Courts-Martial, United States, 1969 (Revised edi-

tion), begins with the general proposition that "[e]vidence of a person's character or a trait of" his character is inadmissible "for the purpose of proving that the person acted in conformity therewith on a particular occasion." However, this proposition is subject to these exceptions: (1) "[e]vidence of a pertinent trait of ... [an accused's] character ... offered by" him, "or by the prosecution" for rebuttal; (2) "[e]vidence of a pertinent trait of [the victim's] character ... offered by an accused, or by the prosecution" in rebuttal; (3) "[e]vidence of ... [a witness'] character" for truthfulness to support or attack his credibility (*see* Mil. R.Evid. 608(a)).

For purposes of this Rule, it cannot be denied that someone's trusting nature as to his fellow men and women is a character trait of that person. The Government in this Court has suggested, without citation of authority, that a "trait of the character of the accused" within the meaning of Mil. R.Evid. 404(a)(1) is limited to a "moral disposition," "such as honesty, peacefulness, or truthfulness." To the contrary, Dean Wigmore in his treatise on evidence defines a character trait more expansively—as a moral or psychical disposition—and cites as illustrative, this discussion in *Bottoms v. Kent*, 48 N.C. (3 Jones) 154, 160 (1855): "Is a man honest, is he good natured; is he of violent temper; is he modest and retiring, or impudent and forward." IA Wigmore, *Evidence* § 52, p. 1148 (Tillers rev. 1983). Wigmore's view is fully consistent with that of another commentator, quoted by the Government itself: "Character is a generalized description of one's disposition, or of one's disposition in respect to a general trait, such as honesty, temperance, or peacefulness." *McCormick's Handbook of the Law of Evidence* § 195, p. 462 (E. Cleary 2d ed. 1972) (footnote omitted).

■ Indeed, without contest in this regard, this Court has treated such attributes as peacefulness (*see, e.g., United States v. Shields*, 20 M.J. 174 (C.M.A.1985)); good military character (*see, e.g., United States v. Vandelinder*, 20 M.J. 41 (C.M.A.1985)); "character as a drill instructor and his dedi-cation to being a good drill instructor" (*see, e.g., United States v. Piatt*, 17 M.J. 442, 445 (C.M.A.1984)); and lawfulness (*see, e.g., United States v. Clemons*, 16 M.J. 44 (C.M.A.1983)) as character traits within the meaning of Mil.R.Evid. 404(a)(1), even though a reasonable argument might be made that some or all of these do not rise to the high level of moral standards. Considering all this, we are confident that a person's trusting nature toward other people is a character trait within the meaning of Mil.R.Evid. 404(a)(1).

The more difficult question—and, thus, the one more frequently litigated—is whether the character trait in question is "pertinent." A preeminent legal dictionary defines that adjective in these terms:

Applicable; relevant. *Evidence is called "pertinent" when it is directed to the issue or matters in dispute, and legitimately tends to prove the allegations of the party offering it*; otherwise it is called "impertinent." A pertinent hypothesis is one which, if sustained, would logically influence the issue. *Vaughn v. State*, 136 Tex.Cr.R. 455, 125 S.W.2d 568, 570. See *Material*; *Relevant*.

*Black's Law Dictionary* 1030 (5th ed. 1979) (emphasis added). *Accord Ballentine's Law Dictionary* 943 (W. Anderson 3d ed. 1969) ("Having a bearing upon a matter at hand, particularly evidence bearing upon the issues made by the pleadings.").

■ We do not believe that it is inconsistent with the policy of Mil.R.Evid. 404(a) to apply this definition in deciding what character traits of an accused are "pertinent." Thus, for purposes of Mil.R.Evid. 404(a)(1), a character trait is "pertinent" "when it is directed to the issue or matters in dispute, and legitimately tends to prove the allegations of the party offering it." *Black's Law Dictionary, supra*. See generally *United States v. McNeill*, 17 M.J. 451 (C.M.A.1984); *United States v. Piatt* and *United States v. Clemons*, both *supra*.

■ Applying this definition here, we conclude that the accused's trusting nature as to other people was "pertinent" in this

case. The defense theory at trial was that another person, who may or may not himself have stolen the TVs, gave the accused both sets and that the accused had no reason to believe that they were not then his own. Contrariwise, the prosecution's theory was that Elliott had stolen both television sets himself, had sold one, and had kept the other. With the case in this posture, it could fully be expected that the members would ask themselves, in weighing the accused's story, "What kind of person would innocently accept two working television sets as gifts from someone he had only recently met—is that really believable?" In other words, the reasonableness of the accused's story obviously was squarely in issue; and equally obviously, the accused's trusting nature of other people—that is, taking them and what they say and do at face value—was directed to this issue in dispute and legitimately tended to prove the defense version of how Elliott had come into possession of the television sets.

Therefore, contrary to the implication in the military judge's ruling, we do not view the defense effort to present this evidence as an attempt to bolster the accused's credibility as a witness. Instead, it was offered as direct evidence in support of the defense theory that the accused—a blindly trusting person—had innocently accepted the generous gesture of a newly made friend. Mil. R.Evid. 404(a)(1) permits admission of this evidence.

B. *Statements to Rowe and Smythe*

As indicated earlier, defense counsel offered the testimony of Rowe and Smythe to reiterate statements which Elliott had separately made to each in mid-May, presumably before the thefts, and at the end of May, right after the thefts had occurred. Trial counsel objected on these specific grounds, *see* Mil.R.Evid. 103(a)(1): If the testimony as to these out-of-court statements by the accused to the witnesses was offered generally "to prove the truth of the

matter asserted," then it was inadmissible hearsay, *see* Mil.R.Evid. 801(c); and if it was offered as a prior consistent statement for the limited purpose of bolstering Elliott's anticipated testimony, it could only be admitted after Elliott had testified and only "to rebut ... [a] charge ... of recent fabrication" of his testimony, *see* Mil.R. Evid. 801(d)(1)(B). Defense counsel responded that she was not offering the testimony for either purpose. Instead, she intended to offer the evidence to support the accused's defense of mistake-of-fact by way of showing his innocent state of mind when he accepted the television sets from his friend.

The military judge agreed with trial counsel's position. Sustaining the objection on hearsay grounds, the judge hinted that, after the accused had testified and had been cross-examined, such evidence might be admissible as prior consistent statements under Mil.R.Evid. 801. Although Elliott did subsequently testify, he was not cross-examined. Consequently, during both Rowe's and Smythe's later testimony on the accused's behalf, neither made any mention of the May statements— and neither did the accused, pursuant to the military judge's ruling.

Of course, the critical issue in the trial was whether Elliott had stolen the two television sets. The Government introduced no direct evidence that it was the accused who had stolen them. *See* para. 74 *a* (3), Manual, *supra*. Instead, it relied principally on circumstantial evidence of inferences to be drawn from Elliott's admitted possession of the sets within a short time after their removal from the barracks. This was the subject of the following instruction[2] to the members by the military judge:

> The court is further advised that, if the evidence shows that the property was stolen and that the accused had personal, exclusive, conscious, and *unexplained* possession of it, recently after the occur-

---

2. For a less extensive instruction on this subject, *see* para. 3–90*b*, n. 3, D.A. Pamphlet 27–9, *Mili-*   *tary Judges' Benchbook* (May 1982).

rence of the larceny, an inference may arise that the accused stole the property. Whether to draw this permissive inference and the weight, if any, to be given to the inference are matters for your exclusive determination and should be based upon the entire evidence relating to this issue. Thus, *you should consider the nature of the property, the circumstances surrounding the larceny, the lapse of time between the larceny and the time when the articles were found in the exclusive possession of the accused, as well as any evidence which would tend to explain such possession.* In making your decision, you should apply your common sense and your general knowledge of human nature and the ordinary affairs of life. However, if, from the attending circumstances or from any explanation made as to the possession, or in view of all the evidence, you are not satisfied beyond a reasonable doubt that the property was stolen and that it was the accused who stole the property, you must acquit the accused.

(Emphasis added.)

Joining issue with the prosecution, the defense did not contest that the television sets had been stolen. Instead, it sought to convince the members that Elliott was not the thief, by explaining his possession of the sets and thereby rebutting any inference that otherwise might have been drawn from his possession of recently stolen property.[3]

1

■ Evidence as to the accused's mid-May statements to Rowe and Smythe was admissible for this purpose on either of two theories. The first is that it illustrated Elliott's existing state of mind at the time he made the statements—which might then be used to imply that the same innocent state of mind continued several days later when his friend allegedly gave him the television sets. *See* Mil.R.Evid. 803(3). Al-

though defense counsel couched it in terms of "mistake of fact," this was her articulated theory of admissibility—namely, to explain Elliott's possession in innocent terms.

Second, although its potential value may have been realized only recently, *see McCormick on Evidence* § 295, p. 847 (E. Cleary 3d ed. 1984), it has long been settled that such out-of-court statements which reflect the declarant's state of mind are also admissible to prove that the intent subsequently was carried out. *Mutual Life Insurance Co. v. Hillmon,* 145 U.S. 285, 12 S.Ct. 909, 36 L.Ed. 706 (1892). Although Fed.R.Evid. 803(3), which is identical to Mil. R.Evid. 803(3), does not expressly

> address[ ] the question of admitting intent for the purpose of proving the doing of the intended act, there can be no doubt that the *Hillmon* rule continues. In fact, the Federal Advisory Committee's Note states, "The rule of *Mutual Life Ins. Co. v. Hillmon,* 145 U.S. 285 [12 S.Ct. 909, 36 L.Ed. 706] (1892), allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed."

McCormick, *supra* (3d ed.) at 847–48 (footnote omitted). Such factors in this case as the statements' vagueness as to when his friend was going to give him a television, and the necessity here not only for Elliott's stated intent to have continued but also for his friend's stated intent to have continued, go only to the weight to be given the evidence and not to its admissibility. *Id.* at 848.

Accordingly, the mid-May statements to Rowe and Smythe were admissible both to reflect Elliott's then-existing state of mind and to prove that subsequently he acted to carry out the intent reflected in those statements.

2

■ His late-May statements, both made after the thefts, were admissible, too,

---

3. The validity of this inference is presently being considered by this Court in *United States v.*

*Pasha,* 20 M.J. 393 (issue granted).

though for a more limited purpose. While it is clear under the *Hillmon* doctrine that statements of intent to do a future act are admissible to prove that act, a statement by the declarant that he had already done that act is not similarly admissible to prove that it was done. *Id.* at 851. As the Supreme Court said in *Shepard v. United States,* 290 U.S. 96, 105–06, 54 S.Ct. 22, 26, 78 L.Ed. 196 (1933):

> Declarations of intention, casting light upon the future, have been sharply distinguished from declarations of memory, pointing backwards to the past. There would be an end, or nearly that, to the rule against hearsay if the distinction were ignored.

Accordingly, evidence of Elliott's statements to Rowe and Smythe that a friend had given him the television sets was not admissible to prove the fact stated. Mil.R. Evid. 803(3); *United States v. Ferguson,* 15 M.J. 12, 14 n. 1 (opinion of Fletcher, J.) and 23–24 (Everett, C.J., concurring in the result) (C.M.A.1983).

Those later statements were admissible under Mil.R.Evid. 803(3), however, to show Elliott's then-existing state of mind—that is, to show his innocent state of mind at the time he made statements while in possession of the television sets. *See* VI Wigmore, *Evidence* § 1732(6), p. 164 (Chadbourne rev. 1976) ("Statements made during *possession of stolen goods,* naming the source of title—by purchase, finding, or the like—or claiming ownership, are receivable on the verbal act principle (§ 1781 *infra,* where the cases are collected).")." Dean Wigmore explains the relevance of such evidence in this way:

> [T]he inference from the fact of possession [that the possessor is the thief] will be stronger or weaker, according as the possession was not or was in good faith; if a possession in good faith can be made to appear, the inference that the possessor was himself the robber or the thief or the knowing receiver can hardly be strong. Thus, the total significance of the act of possession becomes material; and upon the principle of verbal acts (§ 1772 *supra*), the *utterances of the person while in possession* may be received as *verbal acts* (or, in the common judicial phrase, as "explanatory of possession"); though not as hearsay assertions to evidence the fact asserted.

> On this principle, it would be immaterial what the tenor of the utterance was—whether a claim or a disclaimer of ownership, or an explanation of finding or of purchase or of borrowing, provided only it indicated the intent of the possession. It would also be immaterial that it was made before arrest, or discovery of the goods, or claim made, or suspicion raised, or that it was made after arrest or discovery or claim or suspicion, provided only that it was made during possession.

Wigmore, *supra,* § 1781(4), p. 307.

### C. *Prejudice*

As already indicated, the prosecution's theory that Elliott had stolen the television sets rested primarily on the permissible inference of such from his possession of them soon after their disappearance. Elliott was allowed to explain that possession in his own testimony; but the Government throughout the trial made a consistent and sometimes strident effort to disparage the likely credibility of that explanation. As early as her voir dire of the members, for instance, assistant trial counsel placed Elliott's anticipated version of events in the same category as "fairy tales and stories about mystical and mythical beings; for example, Santa Claus, the tooth fairy and genies in the bottle." Then, in her opening argument she admonished the members "to listen to the details of" the "very interesting story" which Elliott had given the investigator—the same story which, of course, he later reiterated in his trial testimony. She continued her mockery of the accused's testimony in her closing argument, as well. Also, she questioned Sergeant Ravenell about a falsehood which the accused had told him during questioning as to the whereabouts of the second television set.

Against all this, Elliott had no more with which to defend himself than his own credi-

bility, manifested by his demeanor on the stand, and testimony that he was an honest person. It cannot be doubted that the believability of Elliott's story explaining his possession of the stolen property would have been enhanced if the military judge had not erroneously excluded all this evidence that he is a trusting person who takes others and their actions at face value without questioning motives when other people might do so; evidence that well before the thefts he had told two other people on two separate occasions that a friend was going to give him a television set; and evidence that after the thefts and while in possession of one of the television sets he again told two people on two separate occasions that the set in his living room was the one he earlier had told them his friend was going to give him. The existence of prejudice is clear.

## II

■ After Sergeant Ravenell had finished his interrogations of Elliott on June 1, he reduced the substance of the story to writing, and Elliott swore to and signed it. In that statement the accused said, very simply, that a man he had met had given him the two television sets and that he had kept one for his fiancee and had pawned the other one because he did not need it. The statement, which also contained the description of the friend, was admitted into evidence without defense objection. Moreover, without objection Sergeant Ravenell referred throughout his testimony to oral statements which Elliott had made to him during the interviews.

The accused's contention on appeal that evidence as to his statements was inadmissible is precluded by his counsel's failure throughout the trial to object to this now-complained-of evidence, Mil.R.Evid. 103(a)(1); and we cannot excuse his waiver on grounds of plain error. Mil.R.Evid. 103(d). None of this evidence was in any way inconsistent with the defense version of the facts or differed in any way from Elliott's own testimony at trial. Because this evidence, which the Government

sought throughout to discredit as incredible, favored the defense case, there certainly is no basis for arguing now that its admission was plain error, for which failure to object may be forgiven under Mil.R. Evid. 103(d). *See* S. Saltzburg, L. Schinasi, and D. Schlueter, *Military Rules of Evidence Manual* 24–26 (Editorial Comment to Mil.R.Evid. 103) (2d ed. 1986).

## III

After conviction on all charges and specifications despite a vigorously contested trial on the merits, the proceedings moved to the sentencing phase. There, the accused elected to make an unsworn statement which included these comments:

I am very sorry about this whole situation. I realize that I am responsible and that I am ready to accept that responsibility. I have learned a very important lesson as to dealing with someone, that you must be sincere and honest. I have gone down to the owner and paid him back for the $100.00 that he gave me for the TV.

I know for a fact that I will never let something like this happen again.

I feel that you should get punished when you do something wrong. I know that I have been convicted of stealing and I realize that I will be punished. Although I don't want to go to jail, I want you to understand that I really would like to stay in the Air Force. It means a great deal to me. I was hoping to begin college and to someday be a pilot. I have always wanted to stay in the Air Force for a career.

Afterwards, the Government called the accused's commander, Lieutenant Colonel Royal Theberge, to testify as to the accused's rehabilitative potential. During examination by trial and defense counsel, it was revealed that Theberge had been impressed with Elliott's excellent duty performance and excellent attitude the last several weeks. As a consequence, Theberge initially had intended to testify that, in his opinion, the accused "had rehabilitative potential." However, before testify-

ing, trial counsel had interviewed Theberge, during which counsel had advised him of the substance of the accused's unsworn statement. From this, Theberge apparently had inferred that Elliott had then admitted his guilt, which had changed Theberge's opinion. He explained:

> After reconsideration [of] Airman Elliott's admission of guilt, that's what led to my changed opinion. I had been very pleased with Airman Elliott's performance in the barracks. I have been very pleased with his attitude, but now that I know he has admitted guilt and has been leading some folks down the primrose path, I am not too pleased with that and leads me to question his rehabilitative qualities.

Exactly how the accused's unsworn statement was to be interpreted was a matter of disagreement among the trial participants. Defense counsel vehemently maintained on cross-examination of Theberge and in her sentencing argument that the accused had not admitted his guilt but, instead, had simply expressed his responsible acceptance of the court's findings. On the other hand, consistent with Theberge's interpretation, assistant trial counsel strenuously urged during her sentencing argument that in his unsworn statement Elliott had, in effect, admitted that he had lied during the trial on the merits. Pursuant to assistant trial counsel's argument, the military judge later instructed the court members on the limited use which they could make of any evidence or inferences regarding appellant's perceived mendacity. *See United States v. Warren*, 13 M.J. 278 (C.M.A.1982).

■ Certainly the accused's unsworn statement was not crystal clear. Either interpretation is a reasonable one, and the witness was entitled to his own. We see nothing wrong with trial counsel's interviewing the witness prior to his testifying and advising him of the accused's statement, so long as he did so accurately. The record capably demonstrates that trial counsel accurately relayed the substance of

the statement, without himself characterizing it as an admission of guilt. Moreover, defense counsel properly was allowed to reveal during her cross-examination of Theberge that his expressed opinion on rehabilitative potential was based on his interpretation of the accused's statement as an admission of guilt and that, but for that statement, his opinion would have been otherwise. Under these circumstances, we have no doubt that the members were able for themselves to interpret the accused's statement and to weigh appropriately Theberge's evaluation of the accused's rehabilitative potential accordingly.

## IV

■ Despite the accused's own expressed wish to remain on active duty and, further, despite recommendations from the accused's commander, his first sergeant, his supervisor, and the corrections officer that the accused be rehabilitated through the 3320th Correction and Rehabilitation Squadron at Lowry AFB, Colorado, the staff judge advocate recommended that the convening authority approve the trial results without modification. Making reference to Elliott's presentencing unsworn statement, the staff judge advocate reasoned:

> Rehabilitation has a view toward making the offender a productive member of society. In cases such as this, however, it is difficult to recommend rehabilitation for someone who maintains innocence. It is an elementary principle of any rehabilitation program that the offender must admit a wrong. Otherwise, there is no reason to rehabilitate. Without his coming forward, I am afraid the accused would be doomed to failure in a rehabilitation program. Therefore, until a positive step is made by the accused toward rehabilitation, I would not recommend rehabilitation.

In her *Goode*[4] response, defense counsel took issue with this logic, urging that "[t]he fact that A1C Elliott maintains his

---

4. *United States v. Goode*, 1 M.J. 3 (C.M.A.1975).

innocence should not bar him from such participation in that an admission of guilt is not a requirement for successful completion of the retraining program." The staff judge advocate replied in an undated supplemental comment, simply taking general issue with defense counsel's contention. Ultimately, the convening authority substituted a bad-conduct discharge for the adjudged dishonorable discharge, but otherwise he approved the trial results as the staff judge advocate had recommended.

The accused correctly complains on appeal that he was whipsawed by government representatives on the interpretation of his presentencing unsworn statement: Assistant trial counsel had contended to the military judge and in her argument to the members that the accused had admitted his guilt in that statement and that this factor should be considered by the members in determining whether the accused's earlier denial of guilt was a lie which should result in increased punishment. On the other hand, the staff judge advocate, as just mentioned, advised the convening authority that the accused had refused to admit his guilt even after findings to the contrary and that, accordingly, he was not a worthy candidate for rehabilitation.

As we already have indicated, the accused's unsworn statement is rather ambiguous, and either interpretation seems possible. In isolated consideration, then, both the prosecutor and the staff judge advocate acted reasonably in their treatments of the statement. It was not reasonable, however, for different officials of the Government to offer opposite interpretations of the statement and then to use each interpretation to damn Elliott. Although trial counsel and the staff judge advocate sometimes do not act with precisely the same interests in mind, their concerns overlap enough that they certainly do not speak with two entirely separate voices.

However, no specific relief need be granted the accused by reason of the inconsistent positions taken by government representations as to appropriate punishment, because the findings and sentence must be overturned completely as a result of the evidentiary errors discussed earlier in this opinion.

V

The decision of the United States Air Force Court of Military Review is reversed, and the findings and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Judge COX concurs.

Judge SULLIVAN did not participate.