**UNITED STATES**

v.

**Airman First Class Brian D. BENSON, FR307–84–0558, United States Air Force.**

**ACM 32519.**

U.S. Air Force Court of Criminal Appeals.

Sentence Adjudged 30 Aug. 1996.

Decided 29 May 1998.

Appellate Counsel for Appellant: Colonel Douglas H. Kohrt, Lieutenant Colonel Kim L. Sheffield, and Captain Tishlyn Taylor.

Appellate Counsel for United States: Colonel Brenda J. Hollis, Lieutenant Colonel Michael J. Breslin, and Major Robert J. Cantrall.

Before PEARSON, Senior Judge, MORGAN and SPISAK, Appellate Military Judges.

## OPINION OF THE COURT

PEARSON, Senior Judge:

A panel of officer and enlisted court members convicted appellant of using a loaded firearm to assault Kentara Heywood, a 20–year–old civilian whom the prosecutor called a "punk." Article 128, UCMJ, 10 U.S.C. § 928. Appellant's approved sentence is a bad-conduct discharge, confinement for 30 months, forfeiture of all pay and allowances, and reduction to E–1. Appellant challenges the court member selection process and exclusion of impeachment and exculpatory evidence he offered at trial. We find merit in each assignment of error and set aside the findings and sentence.

## FACTS

Appellant had been on active duty only 16 months when he pulled a gun on Kentara Heywood and fired it several times during an off-base altercation. Appellant and Heywood first met about one week before the incident as appellant was leaving the base gym. Heywood, who was driving by the gym, didn't like the way appellant looked at him and called appellant a "bitch ass nigger." Hey-

wood then drove around the gym and pulled alongside appellant again. The two exchanged words and parted. Heywood admitted at trial that appellant was minding his own business at the time and did not start the confrontation. Heywood also admitted that he was the only one who used "fighting words."

A few days later, appellant was driving through town with two friends when Heywood drove by. Both stopped their cars. Appellant and his friends got out and walked over to Heywood's car. Appellant was holding a bat. Appellant and Heywood argued through the passenger window, then Heywood drove off. The next day, Heywood drove onto base to deliver a pizza. When Heywood pulled into a dormitory parking lot, he recognized appellant's voice coming from one of the rooms and began to honk his horn until appellant came out. Heywood yelled at appellant that he wanted to fight him for "pulling a bat on him."

Appellant and several friends walked down to the parking lot. As appellant and his friends entered the parking lot, Heywood drove his car toward appellant. Appellant jumped out of the way, then began throwing rocks at Heywood's car. Heywood yelled "I'm gonna kill you, you punk ass nigger, I'm from New York and we don't play that shit" and left. Heywood returned to base later that night and ended up in a fight with appellant's roommate that resulted in Heywood hitting the roommate with a brick.

The next night, appellant went downtown with another airman. The airman, who was driving, had a loaded pistol between the front seats. The airman testified that he carried the gun for safety and had no idea appellant would join him when he took the gun out of the base armory. Driving through town, they passed Heywood, who yelled out of his car "I'm gonna kill you." The airman and appellant pulled into a parking lot with Heywood following a few moments later. Appellant grabbed the pistol, tucked it under his waistband behind his back, and started walking toward Heywood. Heywood climbed out of his car and walked quickly toward appellant.

According to the four defense eyewitnesses, Heywood was holding one hand under his shirt as he approached appellant, leading each to conclude he had a weapon. At least one witness speculated it was a gun. According to Heywood and the prosecution's one eyewitness, Marc Martinez, Heywood had both hands up as if asking for a fight. When Heywood and appellant were within 5 to 8 feet of each other, appellant pulled the gun from behind his back, said "I'm tired of your shit," and fired 5 shots.

Heywood ducked as appellant fired. According to the four defense eyewitnesses, appellant was aiming the gun up in the air at an angle. According to Heywood and Martinez, the gun was aimed straight at Heywood. Heywood was not hit nor, apparently, was anything else in the vicinity. A police detective testified that he checked the parking lot and surrounding area for bullets or marks, including the building at the end of the parking lot in the line of fire, and saw no bullets or marks. The detective also testified that, several days after the shooting, Martinez told him that appellant was holding the gun over his head when he fired it.

After the shots were fired, appellant walked back to the car and tossed the gun inside. Heywood ran to his car, grabbed a bat, and came back swinging at appellant, hitting him once or twice in the arm. A brawl broke out among the onlookers, which quelled when the police arrived.

## I. COURT MEMBER SELECTION

### Facts

At trial, appellant argued that the court member selection process deliberately and systematically excluded enlisted members below the grade of master sergeant (E–7).

The crux of the motion concerned a memorandum that Colonel Koerner, the special court-martial convening authority (SPCMCA), issued entitled "Nomination of and Service as Court–Martial Members." The memorandum begins by explaining that a disciplined force is the ultimate key to combat readiness. It goes on to emphasize confidence in the judicial system and fairness to the accused in selecting the best officers

and non-commissioned officers (NCOs) as court members. The memorandum then states that "individuals selected for court-martial service should understand that they are personally selected for this important duty by either [the general court-martial convening authority] or myself," that officers and NCOs "have a responsibility to ensure a disciplined force," and "I expect those selected for this important duty to fulfill their responsibility." Finally, the memorandum specifies that group commanders will nominate officers in all grades and NCOs in the grade of master sergeant or above for service as court-members.

The commanders nominated approximately 30 enlisted members to the SPCMCA before trial. Of the 30 names, 3 were senior master sergeants (E–8s), 26 were master sergeants (E–7s), and 1 was a technical sergeant (E–6). Although appellant requested the appointment of enlisted members several weeks before trial, apparently none of the 30 were available. Consequently, the staff judge advocate's (SJA's) military justice section began contacting persons on the installation alpha roster (an alphabetical list of 4500 names) and first sergeants. When they had four master sergeants and four senior master sergeants, they sent the list to Colonel Koerner. The acting SJA reminded the SPCMCA of the member selection requirements of Uniform Code of Military Justice Article 25 and the fact that he could go outside the list of eight nominees if he chose. Colonel Koerner approved the list and forwarded it to the general court-martial convening authority (GCMCA), who selected four senior master sergeants and one master sergeant.

Colonel Koerner testified on the motion. He stated that he was familiar with Article 25 criteria, that Cannon AFB had a large population of master sergeants and senior master sergeants, and that he knew master sergeants and senior master sergeants would meet the requirements of Article 25 in most cases. The purpose of the memorandum, he said, was not to "disallow any capability to take anybody of a, let's say, a staff sergeant [E–5] or tech sergeant [E–6]." Colonel Koerner testified that his SJA's office pre-

pared the memorandum. On cross-examination, he explained that

I felt like, and I still feel like, in most cases, again, it's not excluded that I couldn't find a tech sergeant or staff sergeant that would meet the proper qualifications. But in general a master sergeant has been around long enough in the Air Force, has that additional education level, maturity level experienced with the Air Force. So, it is a general guideline, I guess you might say.

Colonel Koerner admitted that he had never appointed a staff or technical sergeant to sit on a court-martial panel. He was also not informed that his enlisted member picks for this case came from the SJA's resources, not the commanders' nominees.

The military judge ruled that the defense failed to demonstrate institutional bias to achieve a particular result in the selection of court members or that any unlawful command influence occurred.

## Discussion

Court-martial panels are ordinarily composed of commissioned officers. Article 25(a), UCMJ, 10 U.S.C. § 825(a). An enlisted accused may, however, request that the panel be composed of at least one-third enlisted members. Article 25(c)(1), UCMJ, 10 U.S.C. § 825(c)(1). When detailing officer or enlisted members to a court-martial, the convening authority selects those best qualified for the duty by reason of age, education, training, experience, length of service, and judicial temperament (the Article 25 criteria). Article 25(d)(2), UCMJ, 10 U.S.C. § 825(d)(2). Selection of court members on the basis of improper criteria threatens the integrity of the military justice system and violates the UCMJ. *See United States v. Daigle,* 1 M.J. 139, 140 (C.M.A.1975).

In our superior court's most recent analysis of the issue at hand, it warned:

Undoubtedly there is a close correlation between these criteria [Article 25(d)(2)] and the grade of a commissioned or non-commissioned officer. Indeed, because of that correlation, there is a danger that, in selecting court members, a convening authority may adopt the shortcut of simply

choosing by grade. In that event, the resulting blanket exclusion of qualified officers or enlisted members in the lower grades is at odds with congressional intent and cannot be sustained.

*United States v. Nixon,* 33 M.J. 433, 434 (C.M.A.1991). Appellant argues that Colonel Koerner ignored this warning when he limited nomination of enlisted members to master sergeants and above; thus, the selection of his court-martial panel violated congressional intent. We agree.

Exclusion of potential court members based on grade was first addressed in the landmark case of *United States v. Crawford,* 35 C.M.R. 3, 1964 WL 4914 (C.M.A.1964). In *Crawford,* the court focused on the intent of the convening authority, holding that first looking to senior noncommissioned grades for prospective members was permissible as long as the convening authority did not intend to exclude any group on prohibited grounds. *Id.* at 12. *Compare United States v. Yager,* 7 M.J. 171 (C.M.A.1979)(exclusion of E-2 and E-1 members permissible based on demonstrable relationship to Article 25(d)(2) criteria) *and United States v. Nixon,* 33 M.J. 433 (selection of only the two most senior enlisted grades upheld based on explicit testimony of convening authority that he complied with statutory criteria and appointed junior grades to other court panels).

■ When circumstances surrounding the selection process create an appearance of systematic exclusion of qualified persons, however, doubts will be resolved in the accused's favor. *See United States v. Greene,* 43 C.M.R. 72, 1970 WL 7433 (C.M.A.1970)(selection of only colonel and lieutenant colonel members gave rise to the appearance that members had been "hand picked" by the government), *United States v. Daigle,* 1 M.J. 139 (selection process under which commanders asked to nominate only captains and above impermissibly used rank as a device for systematic exclusion of qualified persons), *and United States v. McClain,* 22 M.J. 124 (C.M.A.1986)(concern raised by nomination of only E-4s and above and selection of only E-7s and above, coupled with SJA intent to eliminate lenient sentences, resolved in appellant's favor).

■ In *Crawford,* our superior court took judicial notice "that many enlisted persons below the senior noncommissioned ranks are literate, mature in years, and sufficiently judicious in temperament to be eligible to serve on courts-martial." 35 C.M.R. at 12. We go one step further in taking judicial notice that, in the Air Force, the majority of E-4s have served 5 or more years on active duty, the majority of E-5s have served 10 or more years on active duty, and the majority of E-6s have served 15 or more years on active duty. Air Force Personnel Center, Military Years of Service by Grade (released April 2, 1998) <http://www.afpc.af.mil$. Likewise, we take judicial notice that 88 percent of E-4s have some amount of postsecondary education, 18 percent of E-5s have an associate's or higher degree, and 33 percent of E-6s have an associate's or higher degree. *Id.* at Highest Education Level by Grade.

■ Appellant argues that the impropriety in this case took shape at the court member nomination level. Although Colonel Koerner's memorandum to subordinate commanders resulted in 29 E-7 or above nominations out of 30, the nominations did not factor since the members proposed for selection in this case were hand-picked by the SJA's office. However, Colonel Koerner's E-7 and above mandate was even more effective with his legal staff, who had drafted the policy in the first place and picked only master sergeants and above to serve on appellant's court-martial. At trial, the government offered no explanation for the E-7 and above picks from the entire pool of eligible alpha roster candidates.

Even if we accept at face value Colonel Koerner's assertion that he does not *per se* exclude E-5s and E-6s from service as court members, the practical effect of his policy is that no one below E-7 is selected for court-martial duty at Cannon AFB. Furthermore, we are troubled that the grade E-5 appears to be Colonel Koerner's bottom-line for even considering a potential court member. Even under *Yager,* our superior court only went so far as to permit exclusion of members in grades E-1 and E-2 on the basis of grade. 7

M.J. 171. At Cannon AFB, the reality of the member selection process is that E–3s to E–6s are excluded on only one basis—grade—and that is wrong.

We conclude that the government has failed to demonstrate by clear and positive evidence that no impropriety occurred in the member selection process; thus, we set aside the findings and sentence.

■■■ Our holding is based on three rules. First, while a convening authority may look first to senior grades, grade alone cannot be used as a shortcut in the application of Article 25(d)(2) criteria. *Daigle*, 1 M.J. at 141; *Nixon*, 33 M.J. at 434. Second, the convening authority may not systematically exclude any grade above E–2 in the selection of court members. *Yager*, 7 M.J. at 173. Third, the burden of demonstrating systematic exclusion of qualified persons is on the defense; merely showing a disproportionate selection of higher ranks will not be sufficient. *See United States v. Townsend*, 12 M.J. 861, 862 (A.F.C.M.R.1981).

Finally, we note that appellant does not raise any issue of unlawful command influence based on the tone of Colonel Koerner's letter asking subordinate commanders to nominate court members. We remind commanders and their SJAs that using phrases like "ensure a disciplined force" when asking for court member nominees sounds a lot like "pick hardliners," which would raise unlawful command influence concerns. *See United States v. Lewis*, 46 M.J. 338, 339 (1997)("court stacking" condemned).

## II. EXCULPATORY STATEMENT

### *Facts*

Three months after the shooting, appellant met Airman Basic (AB) D, a female airman who had just arrived on Cannon AFB for her first assignment. Appellant told her that he was in trouble with the law because of a shooting downtown. He explained that he told the authorities that he fired in self-defense because he thought the "other guy" had a gun, but he actually just "wanted to bust a cap in [the other guy's] ass." Several days later, appellant told her that he was just kidding about the "bust a cap" comment and

actually did shoot in self-defense because the "other guy" had a gun. About one month later, AB D reported appellant's initial statement to criminal investigators.

At trial, AB D admitted that, when she went to investigators, she was angry with appellant for telling people they had sexual relations. She said that the other reason she reported appellant was that he had asked her if she could "pad" his paycheck since she worked in finance. She admitted, however, that appellant spoke in a joking tone when he talked about her padding his paycheck.

The prosecutor moved *in limine* to prevent defense counsel from asking AB D about appellant's subsequent statement that he had only been joking about "bust[ing] a cap." Defense counsel opposed this motion on the basis of "completeness," citing Military Rule of Evidence (MIL.R.EVID.) 304(h)(2). The military judge granted the motion under MIL.R.EVID. 802, Hearsay Rule, prohibiting defense counsel from cross-examining AB D about the "just kidding" conversation.

### *Discussion*

■■■ The standard of review on issues concerning admissibility of evidence is whether the military judge abused her discretion. *United States v. Johnson*, 46 M.J. 8 (1997). If the prosecution introduces only part of an incriminating statement against an accused, the defense may introduce remaining portions of the statement under the evidentiary rule of "completeness." MIL.R.EVID. 304(h)(2). The policy behind MIL.R.EVID. 304(h)(2) is analogous to that of MIL.R.EVID. 106; namely, to present statements that ought in fairness be considered contemporaneously with the statement introduced. *See United States v. Morgan*, 15 M.J. 128, n. 5 (C.M.A.1983). The common law rule of completeness was designed to prevent one side from misleading the trier of fact. *Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988).

■■■ This assignment of error asks us to determine how much time can pass between telling a "joke" and being stuck with it. Read literally, MIL.R.EVID. 304(h)(2) can be

interpreted to only permit introduction of words uttered in the same breath as an inculpatory statement. We hold that such a narrow interpretation of the rule does not promote the policy of fairness it is based on.

◼ We see no reason why the admissibility of a "just kidding" should turn on whether appellant said it three seconds or three days after his original comment. In either case, it gives context to and *completes* the statement. Given the fact that AB D did not go to the authorities until one month later, it is hard to imagine why appellant's motives to say "just kidding" would have changed significantly over a three-day period. Even if a good argument can be made that his motives did change during that period, the argument goes to the weight of the statement rather than its admissibility. *Cf. United States v. King*, 461 F.2d 152, 154 (D.C.Cir.1972)(timing is a matter which normally goes to the weight of evidence, not its admissibility). The passage of three days does not, in this case, change whether fairness dictates the statement be considered.

Moreover, had the members known appellant told AB D that he was kidding, it could have led to a different conclusion on the central issue of appellant's state of mind at the time of the shooting. If the members believed that appellant "just wanted to bust a cap in [Heywood's] ass," his case was dead in the water. We note, in this regard, that the prosecutor ended his closing argument with this quote and, during his rebuttal argument, emphasized:

> As for all of this stuff about, you know, whether there were other comments made during the conversation? Remember what [AB D] said it came down to? It finally came down to, she said it went back and forth for a while, well, "what were you troubled about," well, this, that, and, kind of, it was—eventually—drawn out conversation—and what it came down to was, "Well I told them I fired in self-defense, but" and you know the end of that sentence.

This argument leaves the incorrect impression that appellant's last words to AB D concerning Heywood were "I just wanted to bust a cap in his ass." Without any reason

to question whether appellant was serious when he made the comment, the members lacked context to weigh it in. This is evinced by their apparent willingness to believe appellant was the world's worst shot at 5 to 8 feet. We find the government's remoteness concern outweighed by the risk of the members being misled.

◼ Finally, we take issue with the military judge's ruling that appellant's "just kidding" statement was inadmissible hearsay. We agree that hearsay statements are generally inadmissible. MIL.R.EVID. 802. However, a statement that demonstrates the accused's then-existing state of mind is not excluded by the hearsay rule. MIL.R.EVID. 803(3), Then Existing Mental, Emotional, or Physical Condition. Moreover, arguments that an accused's exculpatory state-of-mind comments are merely self-serving are better left to the argument of counsel than used to exclude evidence. *See* Saltzburg, Schinasi & Schlueter, *Military Rules of Evidence Manual*, p. 946–47 (4th ed 1997).

At trial, defense counsel argued that appellant's "just kidding" statement was admissible under MIL.R.EVID. 803(3) and the holding in *United States v. Elliott*, 23 M.J. 1 (C.M.A. 1986). In *Elliott*, trial defense counsel sought to prove innocent possession of a stolen television by offering the accused's statement to a friend that a third person gave him the television. The trial judge refused to admit the statement, ruling it was inadmissible hearsay. On appeal, the Court ruled the statement was admissible to show the accused had an innocent state of mind while still in possession of the television. *Id.* at 8. Applying this analysis to the case at hand, appellant's "just kidding" statement was admissible under MIL.R.EVID. 803(3) to demonstrate his then-existing "kidding" state of mind concerning his "bust a cap" quip.

◼ We conclude that preventing the trial defense team from cross-examining AB D on appellant's "just kidding" statement was error, and that this error was prejudicial to appellant's efforts to demonstrate he was acting in self-defense. This error forms the second basis on which we set aside the findings and sentence.

## III. IMPEACHMENT

### Facts

One month after the shooting, appellant's roommate was sitting in his car at a convenience store when Heywood walked up, lifted his shirt, produced a semi-automatic handgun from the waist of his pants, pulled the slide back and said "Brian [the appellant] missed but I won't." Another airman pumping gas at the station reported this, which resulted in Heywood being charged with aggravated assault—a charge he was facing at the time of appellant's trial. The defense sought to introduce evidence of this incident as *modus operandi*, as well as two other assaults Heywood was involved in. However, the military judge granted a prosecution motion *in limine*, ruling that any relevance of the incidents was "outweighed" by their "ancillary" nature and risk of starting a separate "mini-trial."

On direct examination, Heywood testified that, during the altercation with appellant, "I wasn't tryin' to take nobody's life, I ain't that kind of person." He later testified that "I ain't gonna go buy no gun and do this and that with a gun, you know." On cross-examination, Heywood acknowledged that he had just testified that he was not the kind of person to threaten a life. The defense then requested an opportunity to cross-examine Heywood on the convenience store incident, arguing that Heywood opened the door on his direct examination. The military judge refused, finding the incident irrelevant to appellant's state of mind at the time of the shooting and, once again, that any other relevance was "outweighed" by the "ancillary" nature of the incident and risk of starting a separate "mini-trial" on the issue.

### Discussion

 We first address the military judge's ruling that Heywood's act of drawing a gun on appellant's roommate was irrelevant. The military judge has broad discretion in ruling on the admissibility of impeachment evidence. *United States v. Miller*, 48 M.J. 49, 55 (1998).

 The success or failure of appellant's efforts to show he acted in self-defense turned on what the court members believed about his state of mind—whether he simply wanted to "bust a cap in [Heywood's] ass" or, on the other hand, whether he was attempting to ward off an armed assailant by firing warning shots. The four defense witnesses testified that Heywood approached appellant with his hand under his shirt, leading each to conclude Heywood was concealing a weapon.

The similarity of this event with the convenience store incident could have led the members to find Heywood's scheme for dealing with enemies was to approach and threaten them with a weapon tucked under his shirt. Evidence of other crimes, wrongs or acts is admissible under MIL.R.EVID. 404(b) to show plan or intent. Evidence that Heywood's scheme was to threaten people with a weapon tucked under his shirt is relevant to his plan or intent on the night in question. This evidence could, therefore, have added significant weight to the defense theory of events—that Heywood approached appellant with what appeared to be a weapon under his shirt. That no weapon was found in Heywood's possession does not diminish the relevance of this evidence; after all, no bullets or markings were found as a result of appellant's shots despite the fact that he clearly fired the gun.

In the realm of reasonable doubt, we cannot overlook the chance that evidence of the convenience store incident would have affected the members' view of the facts in question. The fact that this incident occurred subsequent to the shooting affects its weight, but does not affect its admissibility under MIL.R.EVID. 404(b). *See United States v. McClure*, 546 F.2d 670, 673 (5th Cir. 1977)(fact that FED.R.EVID. 404(b) evidence offered by defendant concerned subsequent similar acts affects weight but not admissibility); *cf. United States v. Aboumoussallem*, 726 F.2d 906 (2d Cir.1984)(standard of admissibility is not as restrictive under FED. R.EVID. 404(b) when defendant offers evidence of another's acts). Therefore, we conclude the military judge erred in finding this evidence irrelevant.

We next turn to the military judge's ruling that any other relevance of this evidence was "outweighed" by the "ancillary" nature of the

incident and risk of starting a separate "mini-trial." When Heywood testified on direct examination that he wasn't the kind of person to try to take someone's life and he "ain't gonna go buy no gun and do this and that with a gun," he opened the door to impeachment by contradiction. *Compare United States v. Pruitt,* 43 M.J. 864 (A.F.Ct.Crim.App.1996)(witness who denies committing certain misconduct may be impeached by contradiction), *aff'd,* 46 M.J. 148 (1997), *and United States v. Welker,* 44 M.J. 85 (1996)(discussing methods of impeachment).

 Heywood portrayed himself as someone who would not buy a gun, threaten a person's life with a gun, or "do this and that with a gun." This portrayal was directly at odds with proffers of the convenience store incident. Concerns of the "ancillary" nature of this evidence or starting a "mini-trial" pale in comparison to the relevance of this evidence to Heywood's truthfulness. As the alleged victim, Heywood's version of the events was the core of the prosecution's case. Based upon the members' verdict, it appears they found Heywood's testimony more convincing than that of four defense witnesses. Cross-examination of Heywood on this matter could have turned the tables.

Finally, we find the military judge's ruling that this evidence was *outweighed* by "ancillary" and "mini-trial" concerns misses the mark. The military judge repeatedly ruled that the relevance of defense evidence was merely *outweighed* by other concerns; MIL. R.EVID. 403 only permits exclusion of relevant evidence that is *substantially outweighed* by such concerns.

The military judge erred in conducting her MIL.R.EVID. 403 balancing test. We conclude that this error was prejudicial to appellant. This error forms the third basis on which the findings and sentence are set aside.

## IV. STAFF JUDGE ADVOCATE'S RECOMMENDATION

Though not raised as an error by appellant's counsel, we note one matter in the record of trial that merits comment. The Staff Judge Advocate's Recommendation does not provide a summary of appellant's character of service as required by Rule for Courts–Martial 1106(d)(3)(C). This error is mooted by our disposition of this case.

## V. DECISION

The findings of guilty and sentence are set aside. The convening authority may order a retrial.

Judges MORGAN and SPISAK concur.