# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
MULLIGAN, FEBBO, and WOLFE
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Sergeant PRINCE J. BROWN**
**United States Army, Appellant**

ARMY 20160195

Headquarters, 21st Theater Sustainment Command
David H. Robertson, Military Judge
Colonel Paula I. Schasberger, Staff Judge Advocate

For Appellant: Captain Joshua B. Fix, JA (argued);[1] Lieutenant Colonel Christopher D. Carrier, JA; Captain Michael A. Gold, JA; Captain Joshua B. Fix, JA (on brief); Lieutenant Colonel Christopher D. Carrier, JA; Captain Bryan A. Osterhage, JA; Captain Joshua B. Fix, JA (on reply brief); Lieutenant Colonel Christopher D. Carrier, JA; Captain Bryan A. Osterhage, JA; Captain Joshua B. Fix, JA (on brief on specified issues).

For Appellee: Captain K.J. Harris, JA (argued); Major Virginia Tinsley, JA; Captain K.J. Harris, JA (on brief); Captain Austin Fenwick, JA; Captain K.J. Harris, JA (on brief on specified issues).

28 February 2018

----------------------------------
OPINION OF THE COURT
----------------------------------

WOLFE, Judge:

On the evening of Christmas Day, 2016, several soldiers and locals happened upon each other while drinking and playing pool at Blue's Bar in Baumholder, Germany. By the early hours of the next day, a local German woman, Ms. LS, had

---

[1] We heard oral argument in this case on 28 January 2018 at Loyola University Chicago School of Law as a part of "Project Outreach," a public awareness program demonstrating the operation of the military justice system.

died moments after having been punched in the head. A thrown beer bottle broke over the face of a second woman, Ms. LW, causing a broken nose and severe cuts.

Appellant was charged with the murder of Ms. LS and the aggravated assault of Ms. LW, in violation of Articles 118 and 128, Uniform Code of Military Justice, 10 U.S.C. §§ 918, 928 (2012) [UCMJ]. Acquitted of murder, appellant appeals his conviction for aggravated assault.[2] Appellant assigns four errors, three of which we discuss below.[3] We first find no error when the military judge denied the defense motion to suppress a witness identification. Next we determine that the military judge did not abuse his discretion when he denied the defense motion to compel character witnesses. Finally, we find no error when the military judge admitted notes taken within five minutes of the offense as a "present sense impression."

## BACKGROUND

The murder and assault charges both arose out of the same event, separated by at most a few minutes. At trial, the two offenses were inextricably connected during the presentation of both the parties' cases. Accordingly, to provide context and

---

[2] At a general court-martial the panel of officer and enlisted members acquitted appellant of murder but convicted him of the aggravated assault. The court-martial sentenced appellant to a bad-conduct discharge, confinement for 180 days, and a reduction to the grade of E-2.

[3] We do not discuss in depth appellant's argument regarding improper judicial notice. At trial, the government filed a motion for the court to take judicial notice that appellant was the local undefeated combatives' champion. *See* Military Rule of Evidence 201. To prove this was a fact not "subject to reasonable dispute," the government provided the court with the base newspaper that contained a news article describing the championship. Over defense objection, the military judge took judicial notice. At trial, appellant never actually disputed that he was the combatives champion. Rather, appellant contested whether a newspaper was sufficient evidence to prove this fact and whether the evidence was more prejudicial than probative. We do not directly address this issue because, even assuming the military judge erred, any error was not prejudicial. Evidence that appellant was a combatives champion was admitted and argued for the purpose of proving that appellant's single strike to Ms. LS's head was with sufficient force to kill her. As appellant was acquitted of this offense, we find any error was harmless.

assist with our prejudice analysis below, we discuss the factual background of both offenses notwithstanding that appellant was acquitted of murder.[4]

There were several people in the bar at the time of the assault. The witnesses' testimony was inconsistent at times but, after reviewing the entire record, we find the following facts:

Appellant arrived at the bar with some friends. Appellant then introduced himself as "Chris" to Ms. LS and Ms. LW and told them one of his friends was "interested" in Ms. LS. The friend was Specialist (SPC) Faatau, who was completely drunk. Appellant, unlike SPC Faatau, is large, fit, and very muscular.

Appellant's conversation with Ms. LW was initially cordial, with the two of them comparing tattoos. Appellant has numerous tattoos, to include a "sleeve" tattoo on one arm. However, in his drunken state, SPC Faatau began to annoy Ms. LS. The two woman left the table and went to play pool.

---

[4] We briefly explain why the panel's verdict was not inconsistent. The military judge instructed the panel that appellant was charged with unpremeditated intentional murder. *See* Article 118(2), UCMJ. This offense required proof that appellant intended to kill or inflict grievous bodily harm on Ms. LS. Over the objection of both parties, the military judge also instructed the panel on the lesser-included offense of voluntary manslaughter. *See* Article 119, UCMJ. Voluntary manslaughter also required proof beyond a reasonable doubt that appellant intended to kill or cause grievous bodily harm to Ms. LS. Thus, the panel was instructed that, to find appellant criminally responsible for the death of Ms. LS, they were required to conclude appellant either intended to kill Ms. LS or intended to inflict grievous bodily harm when he punched her in the head. Other than evidence of the punch itself, which resulted in no obvious injury to Ms. LS's head, there was little direct or circumstantial evidence to support a conclusion that appellant intended to cause death or grievous bodily harm.

Instead, there was substantial evidence from both government and defense expert witnesses that a previously unknown medical condition contributed to Ms. LS's death. The wall of Ms. LS's aorta was exceptionally thin and had developed a tear, which lead directly to her death. The cause of the tear was hotly contested, with the government arguing the punch was the proximate cause of the tear and therefore her death. But, critically, no one knew of Ms. LS's condition, undermining the government's case that appellant punched her with the required intent. Although the government requested an instruction on the lesser-included offense of involuntary manslaughter, which would have required only proof of appellant's culpable negligence in causing Ms. LS's death, the military judge never ruled on the government's request.

After a few minutes, appellant followed the two women to the pool table. Ms. LS began to grow irritated when appellant and SPC Faatau continued to talk to them while the women continued to reject their advances. Without finishing their pool game, the two women decamped and moved to the bar area. Appellant and SPC Faatau followed them. Specialist Faatau grew increasingly irritating as he was slumped on the bar and repeatedly kept asking the women for their names.

Accounts varied about what happened next. Ms. LW testified that SPC Faatau accidentally knocked his beer onto her. Other witnesses described both appellant and one of the women pouring beers on each other. At some point in the exchange, Ms. LS told appellant, who is from Somoa, to "go back to your [] island."

There were several disinterested witnesses in the bar.

The bartender testified that the larger of the two men threw a beer glass at the two women, which missed and crashed against the back of the bar.[5] While ducking behind the bar she heard, but did not see, the next throw which she presumed struck Ms. LW in the face.

Specialist Rine was also at the bar. Specialist Rine did not know appellant, Ms. LS, or Ms. LW. He testified that as the verbal altercation escalated, a large man with a build like an Ultimate Fighting Champion (UFC) fighter repeatedly threw things.[6] First, the man twice threw some type of liquid (presumably beer) at the two women. Then, SPC Rine saw him throw a cup or a bottle that hit a wall. Specialist Rine then testified he saw the large man throw "a bottle, and it hit the lady that was sitting next to [Ms. LS] at the bar." He testified, "It kind of hit her in the face. She had a cut on her face that started bleeding a lot." A photo taken at the scene and introduced at trial shows a pool of blood on the floor consistent with his testimony.

Specialist Rine then retrieved some paper towels to assist with Ms. LW's facial injury. When he returned he saw the man who threw the bottle come back into

---

[5] The bartender's video recorded deposition was admitted. She did not know appellant and did not identify him during her deposition. She identified and labeled appellant and his friends by their appearance. One soldier she labeled "Heineken" because that was the beer he was ordering. A second soldier she called "bumblebee" because he was wearing black and gold Pittsburgh Steelers paraphernalia. The third person, and the person she identified as having thrown the first glass, she called "Hefe" because of his large size. When considered in the context of the testimony of the other witnesses, to include appellant's relative size, it is clear that appellant was "Hefe."

[6] As with the bartender, SPC Rine did not identify appellant in court as the person who threw the bottle. However, he described the attacker as having a build like a "UFC" fighter.

the bar. Specialist Rine then saw the man, the same person who threw the bottle, punch Ms. LS in the face. He testified that Ms. LS took a few steps back, looked stunned, and then "laid down on the ground and started making these gurgling, almost like choking snoring noises." While SPC Rine never identified appellant in court, appellant was the only person described in the record who met SPC Rine's physical description of the assailant.

Mr. Goohe was also a patron at the bar who knew neither appellant nor the two women. He witnessed the altercation escalate from a verbal argument into a physical confrontation. Although he could not identify appellant in court, he testified that the larger of the two men (appellant) threw an ashtray and a beer at the two women. He further testified that the same person then threw a bottle at the two women. The bottle missed, broke against the wall, but hit and cut Ms. LW's face as it ricocheted off the wall. He then saw both men briefly leave the bar. He testified that the larger man then reentered the bar while the smaller man tried to restrain him. He then saw the larger man punch at Ms. LS, connecting with her head. After Ms. LS was hit, he saw her walk back a few steps and, like she was fainting, fall on the floor. He reiterated in his testimony that while he could not identify appellant, the person who threw the bottle was the same person who hit Ms. LS.

The testimony from Mr. Goohe and SPC Rine was strong circumstantial evidence that appellant was the person who threw the bottle that struck Ms. LW in the face. Both described the assailant as the bigger of the two men–consistent with appellant being the attacker. Additionally, Ms. LS's DNA was found on appellant's wedding ring. While neither SPC Rine nor Mr. Goohe could identify appellant in court, they both testified that the person who threw the bottle at Ms. LW's face was the same person who punched Ms. LS in the head. Accordingly, when combined with testimony, the DNA evidence connected appellant to the assault on Ms. LW.

In court, Ms. LW identified appellant as being the person who threw the bottle that hit her in the face. She testified that the bottle broke upon impact, leaving green shards of glass in the wound. She suffered from a severe laceration and a broken nose that had to be reset.

## DISCUSSION

*A. Should the military judge have suppressed Ms. LW's in-court identification of appellant?*

While SPC Rine and Mr. Goohe identified appellant as the attacker by inference, Ms. LW was the only witness who specifically identified appellant. At trial and on appeal, appellant asserts that the military judge erred in not suppressing Ms. LW's identification. Specifically, he alleges that the procedures used by German police for a photographic lineup were overly suggestive, which therefore tainted the in-court identification.

5

*1. Additional facts regarding the photo-lineup*

Prior to reviewing the photos, Ms. LW had described the person who had introduced himself as "Chris" at the bar, the English translation was as follows:

> About 26-29 years old, muscular built, especially the arms, about 5'11" tall, black Mauri tattoos on both arms. The tattoos reached to the middle of the forearm, wearing a black T-Shirt, dark pants, and ugly looking leather shoes, Spanish looking, from some island, not black not white, southern looking, no glasses, no beard, hair style unknown because he wore a base [sic] cap, no further abnormalities.

Ms. LW was also advised about how the lineup was to be conducted. She would be shown sixteen pictures one-by-one and in no particular order. She was advised that the person who committed the crime "may or may not" be included in the lineup.

To select the photos for the lineup, the police used a computer program. An officer inputted the suspect's age, nationality, and other characteristics such as identifying marks, and whether the suspect wore glasses or had a beard. Based on these inputs the program outputted photographs for use in the photo lineup.

As noted above, appellant is Polynesian. The database used by the program did not include photographs of persons whose ethnicity is Polynesian or Pacific Islander. As such, the program output pictures of Black and Asian men. The officer testified that "the system produced these persons that were close to the suspect."

Ms. LW was shown the photos one-by-one, and with each photo was given the opportunity to say something. Upon reviewing the seventh photo she stated the individual "looks like" the person from the bar. This was appellant's photo. She further stated, "[i]f I would see the arms, I could directly identify the tattoos." She then stated she could "exclude" the other photos. As we noted above, Ms. LW and appellant had compared tattoos in the bar. The officer then showed Ms. LW two additional photos.

The first photo was of appellant clothed with his tattoos not visible. Ms. LW said that "it could be" him, "[b]ut I'm not really sure."

The police then showed Ms. LW a second photo of appellant without his shirt and clearly displaying his tattoos. After seeing a photo that included appellant's tattoos Ms. LW said it was "definitely" the person at the bar.[7]

### 2. *Law and analysis*

Military Rule of Evidence [Mil. R. Evid.] 321 governs the admissibility of witness identifications. The rule loosely tracks Supreme Court jurisprudence on the admissibility of witness identifications (*see* infra). However, we need not identify any discrepancies between the rule and constitutional jurisprudence because, by its own terms, the identification procedures used in this case fall outside of the rule.

An identification is inadmissible under the rule under two circumstances:

First, an identification conducted by "United States or other domestic authorities" is inadmissible if it is so "suggestive as to create a substantial likelihood of misidentification" or, for in-person lineups, fails to comply with an accused's rights to counsel under both military and civilian law. Mil. R. Evid. 321(b)(1), (c). There is no evidence the German police conducted the photo lineup at the behest or in coordination with U.S. military law enforcement. Accordingly, this provision is inapplicable.

Second, evidence of an identification must be excluded when "required by the Due Process Clause of the Fifth Amendment to the Constitution of the United States as applied to members of the Armed Forces." Mil. R. Evid. 321(b)(2). This is the provision that is applicable, and therefore the question before us is one of pure Constitutional law unshackled by the drafting of the rule.[8]

---

[7] There is one additional wrinkle that the defense raised both at trial and on appeal. Ms. LW was the daughter of a German police official. The person conducting the photo lineup with Ms. LW knew her and they lived about half a kilometer from each other. The same officer also recognized appellant as they frequented the same gym.

Over government objection, the military judge allowed defense counsel to explore this issue at the suppression motion. While the defense engaged in a reasonable line of inquiry, they were unable to develop evidence of bias to demonstrate the photo lineup was affected by the officer's prior acquaintance with Ms. LW or appellant.

[8] In *Neil v. Biggers*, an identification is only inadmissible if the process used was both unreliable and "unnecessary" under the circumstances. 409 U.S. 188, 199-200 (1972). For reasons that are not made clear by the Drafter's analysis, Mil. R. Evid. 321 does not require the identification process be "unnecessary." *See* Mil. R. Evid. 321 analysis at A22-37 to -38. Thus, for example, a strict reading of the rule would not differentiate between showing a witness a single photo of a suspect when police

(continued . . .)

We apply a two-prong test based upon Supreme Court case law for determining admissibility of eyewitness identification. "First, was a pretrial identification unnecessarily suggestive?" *Rhodes*, 42 M.J. at 290 (citing *Stovall v. Denno*, 388 U.S. 293 (1967)). "Second, if the pretrial identification was 'unnecessarily suggestive,' was it conducive to a substantial likelihood of misidentification?" *Id.* (citing *Manson v. Brathwaite*, 432 U.S. 98 (1977)).

Finally, as we are an appellate court, we review the trial judge's decision to admit evidence for an abuse of discretion. *Id.* (citing *United States v. Webb*, 38 M.J. 62, 67 (C.M.A. 1993)). To find an abuse of discretion we would need to find an "arbitrary, fanciful, clearly unreasonable, or clearly erroneous" action by the military judge. *United States v. White*, 69 M.J. 236, 239 (C.A.A.F. 2010) (citation omitted).

As to the first prong, we do not find the identification procedure used by the German police to be unnecessarily suggestive. Ms. LW was shown sixteen photos. She identified the photo of appellant as "look[ing] like" the person at the bar. While only two of the photos contained in the array depicted persons of Polynesian ethnicity (appellant and SPC Faatau) our review of the photograph lineup (which admittedly consists of black and white photocopies) does not reveal that this was overly suggestive.

Nor was it unnecessary. Our superior court has quoted favorably that even a one person "show up" is not always *unnecessarily* suggestive:

> An immediate identification while the witness' memory is still fresh and when there are no grounds for holding a suspect has been held not to be unnecessary under the Due Process Clause of the Fifth Amendment. *Johnson v. Dugger*, 817 F.2d 726, 729 (11th Cir. 1987); *State v. Perkins*, 141 Ariz. 278, 686 P.2d 1248, 1259 (1984). It is

(. . . continued)
seek to identify an active shooter (likely necessary) and when showing the witness a single photo in a police station hours after the danger has passed (likely unnecessary). Notwithstanding the rule's omission, our superior court has generally interpreted Mil. R. Evid. 321 in a manner that reads into the rule current Supreme Court case law. *See e.g. United States v. Rhodes*, 42 M.J. 287, 290-91 (C.A.A.F. 1995). The rule also provides that an identification subsequent to an unreliable identification may be admissible only upon clear and convincing evidence that the former is untainted by the later. *See* Mil. R. Evid. 321(d)(6)(B)(ii). While applicable to Sixth Amendment violations, our research has been unable to find any Supreme Court case applying that standard to Fifth Amendment issues as is the issue here.

8

> important to have a one-on-one confrontation take place
> immediately after a crime while memories are fresh
> so innocent individuals may be released. *Id*. An
> immediate confrontation permits investigative activities to
> be refocused if there is no identification. *State v. Collette*,
> 199 Conn. 308, 310-11, 507 A.2d 99, 101 (1986).

*Rhodes*, 42 M.J. at 290-91. If a "one-person show-up" is not unnecessarily suggestive in such cases, it was not unnecessarily suggestive to proceed with the photo-lineup shortly after the offense without first finding and including additional images of Polynesians.

For similar reasons, we do not find it to be unnecessarily suggestive that the German police showed Ms. LW a single photo of appellant shirtless. Ms. LW had already picked out appellant's photo from the array of sixteen photos as "look[ing] like" the person at the bar. She effectively stated that she could positively identify appellant if she could see his tattoos.

However, assuming there was an "unnecessarily suggestive" photo lineup, we will examine the second prong to determine whether the identification at trial was reliable.

> The following factors support a reliable identification:
> "opportunity to view" the actual perpetrator of the
> offense, *Manson v. Brathwaite*, 432 U.S. at 114; *Neil v.
> Biggers*, 409 U.S. at 199; "the witness' degree of
> attention," 409 U.S. at 199; a short "length of time
> between the crime and the confrontation," 409 U.S. at
> 199-200; *see* 432 U.S. at 115; no discrepancy between
> offender's description and appellant, 432 U.S. at 115; and
> little likelihood of other individuals in the area at the time
> of the offense matching the description given by the
> victim.

*Rhodes*, 42 M.J. at 291.

Ms. LW spent substantial time with appellant at the bar and had ample opportunity to observe him. Her description of appellant, which was made before the photo lineup was conducted, was detailed. The police conducted the photo

9

lineup on the same day as the assault.[9]  There was not a substantive likelihood of misidentification at trial.

Accordingly, we find no error when the military judge allowed Ms. LW to identify appellant in court.

### B. Did the military judge abuse his discretion in denying appellant's motion to compel the production of certain character witnesses?

Prior to trial the defense requested the government obtain the production of twenty-six witnesses.  The government denied the production of nine witnesses.  Of those, the defense filed a motion to compel the production of eight.  The military judge denied the motion.  On appeal, appellant asserts the military judge erred as to six of the witnesses.  While we discuss all six, only three witnesses merit detailed discussion.[10]

Of the six witnesses, Major (MAJ) Tumpap and Mr. Sokugawa were to provide character evidence during findings.  First Lieutenant (1LT) Flores and Mrs. Swaford were to testify only in sentencing.   Captain Snyder and MAJ Pattumma were to testify as to appellant's character during findings as well as provide sentencing evidence.  The proffered character evidence included opinions as to appellant's peacefulness, law-abidingness, truthfulness, and good military character.

This appeal requires us to address two substantive issues.  First, given recent amendments to the rule, when is evidence of good military character admissible in a case of aggravated assault?  Second, when are character witnesses who knew an accused at various points of his life cumulative?

---

[9] For this issue, we limit our review to the evidence that was introduced and considered by the military judge in deciding the suppression motion.  Having lost the suppression motion, the defense case focused on whether he or SPC Faatau threw the bottle that hit Ms. LW, and, with respect to the murder charge, issues of causation and self-defense.  Accordingly, in reviewing whether the military judge abused his discretion by allowing Ms. LW's in-court identification of appellant, we do not rely on the substantial evidence introduced at trial that appellant threw the bottle that hit Ms. LW.

[10] We do not discuss in depth the production of Captain (CPT) Snyder or the two witnesses who were to be produced only for sentencing.  The defense only requested the telephonic production of CPT Snyder.  The military judge denied the request.  However, any error was not prejudicial as CPT Snyder testified telephonically for the defense.  The production of sentencing witnesses is governed by the strict standards of Rule for Court-Martial 1001(e)(2).

*1. The "Good Soldier Defense."*

We first address whether evidence of appellant's good military character was admissible at trial. If it was not admissible, then the military judge did not err in refusing to grant appellant's motion to compel the production of witnesses who would testify to appellant's military character.

In his motion to compel production, appellant requested the presence of MAJ Pattumma, appellant's former company commander. The motion summarized the content and relevance of MAJ Pattumma's testimony as follows:

> SGT Brown is an outstanding Soldier and good NCO who always followed the rules and acted as you would expect a good soldier to act. [Sergeant] Brown's good military character is pertinent in this case because a good soldier would not harass and attack two women in a bar. A good Soldier follows the rules 24-7, and lives by the Army values.

The admissibility of evidence of good military character, offered to prove that the accused did not commit the offense, was sharply curtailed by legislative directive in 2015. *See* Carl Levin and Howard P. "Buck" McKeon National Defense Authorization Act for Fiscal Year 2015 [2015 NDAA], Pub. L. No. 113-291, § 536, 128 Stat. 3292, 3368 (2014) (Modification of Military Rules of Evidence Relating to Admissibility of General Military Character Toward Probability of Innocence); Exec. Order No. 13,696, 80 Fed. Reg. 35,781, 35,818 (June 17, 2015) (amending Mil. R. Evid. 404(a) to its current form).[11] As amended, evidence of an accused's general military character is prohibited outright for numerous offenses. *See* Mil. R. Evid. 404(a)(2)(A)(i)-(iii) (prohibiting general military character evidence for offenses alleged under Articles 120-120a; 125-127; 129-132). For all other offenses, evidence of an accused's general military character is prohibited when the character evidence "is not relevant to any element of an offense for which the accused has been charged." Mil. R. Evid. 404(a)(2)(A)(iv).

The amendment to the rule called into question decades of case law assessing when evidence of good military character is admissible at a court-martial. For example, in *United States v. McNeill*, 17 M.J. 451 (C.M.A. 1984), our superior court reversed the accused's conviction under Article 125, UCMJ, because the military judge improperly excluded evidence of the accused's good military character. In *United States v. Benedict,* the court set aside a sexual molestation conviction because evidence of the accused's "awards, decorations, and officer effectiveness

---

[11] Appellant's was arraigned at his court-martial after the amendment to Mil. R. Evid. 404(a) became effective.

reports as evidence of the specific character trait of 'good conduct as an officer'" had been excluded. 27 M.J. 253, 262 (C.M.A. 1988). However, as Congress now specifically prohibited admitting good military character for violations of Articles 120 and 125, UCMJ, it seems certain that *McNeill* and *Benedict* are no longer good law as applied to those specific articles.

Appellant, however, was convicted of aggravated assault under Article 128, UCMJ. This offense is not one of the offenses specifically excluded by the amended rule. Accordingly, we must determine whether evidence of good military character is "relevant to any element" of the offense of aggravated assault under Mil. R. Evid. 404(a)(2)(A)(iv).

As an initial matter, we first consider what the amendment to Mil. R. Evid. 404(a) did *not* do. The rule change did not change an accused's ability to admit evidence of his character as a law-abiding person. *See e.g. United States v. Clemons*, 16 M.J. 44, 46-47 (C.M.A. 1983). Nor does the amendment prevent appellant from admitting his character for peaceableness. *See e.g. United States v. True*, 41 M.J. 424, 426 (C.A.A.F. 1995) (citing *United States v. Credit*, 8 M.J. 190 (C.M.A. 1980)) (recognizing evidence of an accused's peaceableness may be admissible in a rape case). As these two character traits (among others)[12] remain entirely viable, we are only concerned with the restrictions on "good soldier" evidence to the extent that it allows for inferences based on something *other than* one's law-abidingness, peacefulness, and other character traits that remain entirely permissible.

We find that evidence of appellant's good military character was not admissible for two independent reasons.

First, evidence of an accused's good military character is now only admissible if the evidence is a "pertinent trait" and "relevant" to "any element" of the offense. Mil. R. Evid. 404(a)(2)(A)(iv). We think it incorrect to read this exception so broadly as to swallow the rule. As the defense claimed in their trial motion, it can be argued that good soldiers do not commit crimes and therefore, evidence that one is a good soldier is always a pertinent character trait and is relevant to every element

---

[12] Our superior court has recognized many other character traits proffered by an accused as pertinent under the facts of a particular case under Mil. R. Evid. 404(a). *See e.g. United States v. Elliot*, 23 M.J. 1, 5-6 (C.M.A. 1986) (character evidence concerning an accused's "trusting nature" admissible and pertinent to larceny charges); *United States v. Pearce*, 27 M.J. 121, 123-24 (C.M.A. 1988) (character for honesty may be offered to disprove allegation of larceny); *United States v. Brown*, 41 M.J. 1, 4 (C.M.A. 1994) (in drug use case, military judge erred in barring evidence of accused's strong opposition to the use of drugs and alcohol as a matter of religious principle).

of every offense. "Under the Federal Rules of Evidence, a generally good character as a person is no longer a fact relevant for the above purpose." *United States v. Piatt*, 17 M.J. 442, 445 (C.A.A.F. 1984). "Instead, only a particular trait of such a character is admissible for this purpose and then only when this character trait is pertinent to a particular issue in the case." *Id.* *See also* Federal Rule of Evidence 404(a)(1); *cf. Michelson v. United States,* 335 U.S. 469 (1948).

Prior to the adoption of the military rules of evidence, evidence of "general military character" was permissible. *See* Stephen A. Saltzburg, Lee D. Schinasi, David A. Schlueter, *Military Rules of Evidence Manual* [SALTZBURG] 4-82 (6th ed. 2006). Although the adoption of the Military Rules of Evidence in 1980 would have appeared to prohibit general character evidence, some confusion remained:

> Although the military version of 404(a)(1) is identical with its federal counterpart in prohibiting general character evidence, the Drafters' Analysis suggests that the defense will still be able to introduce general good military character if the accused is charged with a uniquely military offense.

*Id.* As further explained, "military courts have expanded the use of this evidence to virtually any offense a service member is charged with." *Id.* at 4-82 n.14. Thus, according to SALTZBURG, military courts were, arguably contrary to the rule, permitting general character evidence without requiring pertinence.[13]

Congress's amendment to the rule prohibited *general* military character evidence unless it is relevant to a specific element of an offense. Thus, in one sense, the amendment did little as general character evidence was already prohibited. Our superior court usually allowed military character evidence under the rubric of it being a specific trait. "[A] person's military character is properly considered a particular trait of his general character and a fact which may be relevant at a court-martial depending upon the issue for which it is offered." *Piatt*, 17 M.J. at 446 (citation omitted).

However, to the extent that military courts had effectively read out of the rule a requirement for pertinence when considering the admissibility of military character evidence, the recent amendment reinserted that requirement.

---

[13] Consider that in *Benedict*, our superior court reversed the conviction because *specific instances* of character (i.e. not reputation or opinion) were not admitted. 27 M.J. at 262. This was a view of military character evidence that maintained fidelity with the use of military character evidence permitted in the 1969 Manual.

Thus, in a sense, the amended rule may be returning us to a state similar to that when the rule was first enacted. "In order to find an accused's good military character admissible during the findings portion of a trial, we believe there must be some direct connection between that specific character trait and the offense charged." *United States v. Cooper*, 11 M.J. 815, 816 (A.F.C.M.R. 1981) (interpreting Mil. R. Evid. 404(a)(1) shortly after its enactment).

While we need not examine every punitive article, an accused's general military character would be most likely relevant when an accused is charged with an offense such as conduct unbecoming an officer under Article 133, UCMJ. For that offense, the accused's military character is directly relevant to one of the elements.[14] By contrast, however, except in the broadest of terms, we do not see the relevance of an accused's good military character to any element of aggravated assault.

Second, looking to the facts of the case, this is not an instance where military character was relevant. This offense was committed off base and the key players involved were civilians. Our superior court's jurisprudence on military character evidence has always focused on the connection to military discipline and readiness. *See*, *e.g.*, *United States v. Vandelinder*, 20 M.J. 41, 45 (C.M.A. 1985) ("[A] person of 'good military character' is less likely to commit offenses which strike at the heart of military discipline and readiness."); *United States v. Wilson,* 28 M.J. 48, 50 (C.M.A. 1989) ("[S]tatus of victims did not bear sufficient nexus with appellant's performance of military duty to warrant extension of the 'good military character' instruction" to charges of sodomy, adultery, and indecent language).

Accordingly, we do not find any error when the military judge denied appellant's motion to compel the production of witnesses who were to testify to appellant's good military character.

### 2. When is a character witness cumulative?

In addition to being improper evidence of military good character, the government denied the remaining character witnesses as being cumulative with witnesses that the government had agreed to produce. Appellant cites to *United States v. Williams*, 3 M.J. 239 (C.M.A. 1977), for the proposition that character

---

[14] Conduct prohibited by this article is any action or behavior "in an official capacity which, in dishonoring or disgracing the person as an officer, seriously compromises the officer's character as a gentleman" or "in an unofficial or private capacity which, in dishonoring or disgracing the officer personally, seriously compromises the person's standing as an officer." *Manual for Courts-Martial, United States* (2016 ed.), pt. IV, ¶ 59.c.(2).

witnesses who knew appellant at different times in his life are never cumulative. In *Williams*, Judge Perry wrote:

> Patently, when the appellant's entire defense rested on convincing the factfinders that he has always been a conscientious, honorable, truth-telling serviceperson, testimony of witnesses who knew him at different and succeeding periods of time in the military and whose testimony was limited to their observations and opinions formulated during those different periods of time is not cumulative in any sense.

*Id*. at 243. We do not share appellant's view that *Williams* is persuasive in this case.

First, while Judge Perry was writing for the Court, it is not clear to us that either of the two other judges joined him in his reasoning. Judge Cook dissented. *Id*. at 244 (Cook, J. dissenting). Chief Judge Fletcher, concurring in the opinion, explicitly stated his standard for determining when witnesses must be produced:

> I now articulate the concept as to the procurement of witnesses that I will use in this case and future cases to resolve the problem of when witnesses are necessary. If the testimony of a witness is material in any respect to the exclusion of all other witnesses' testimony, then his presence is mandated. Exhibits do not in my thinking equate to live witnesses. Using this standard, I must concur with the opinion of Judge Perry.

*Id*. (Fletcher, C.J., concurring). By focusing on the necessity and materiality of a prospective witness's testimony, it is far from clear that Chief Judge Fletcher joined Judge Perry's dictum regarding when a witness is cumulative.

Second, *Williams* was decided prior to the promulgation of the Military Rules of Evidence.[15] The operational rule at the time, *Manual for Courts-Martial, United States* (1969 ed.) [*MCM*], ch. XXVII, ¶ 138(f), is substantially different than Mil. R. Evid. 404(a). The 1969 Manual read as follows:

> To show the probability of his innocence, the accused may introduce evidence of his own good

---

[15] The Military Rules of Evidence were first added to the *MCM* on 1 January 1981 pursuant to Executive Order 12,233 (Sept. 1, 1980) and incorporated into Change 4 of the *MCM* (1969 Rev. ed.).

> character, including evidence of his military record and
> standing as shown by authenticated copies of efficiency or
> fitness reports or otherwise and evidence of his general
> character as a moral, well-conducted person and law-
> abiding citizen.

*MCM*, 1969, ch. XXVII, ¶ 138(f)(2). That is, the applicable rule at the time *Williams* was decided provided an accused greater rights to admit character evidence than the current rule allows. While the current rule limits character evidence to opinion and reputation evidence, *see* Mil. R. Evid. 405, at the time *Williams* was decided an accused could admit efficiency reports–and the specific acts contained therein–to prove his innocence. While the 1969 Manual did limit evidence of a specific character trait (e.g., evidence of peacefulness was inadmissible in the case of a non-violent theft), there was no requirement that general character evidence be pertinent to the offense charged.

Third, *Williams* is a case in which the accused's entire defense hinged on his good character. Indeed, the sentence relied on by appellant is conditioned upon a case "when the appellant's entire defense rested on convincing the factfinders that he has always been a conscientious, honorable, truth-telling serviceperson." *Williams*, 3 M.J. at 243. This condition is not met here, as the defense case focused on causation, identity, and self-defense.

Fourth, to read *Williams*, as appellant requests, ignores the purpose of character evidence as we see it. Like all evidence, character evidence is only relevant when it tends to make some fact of consequence more or less likely. Mil. R. Evid. 401. A character trait of the accused at the time of the offense may be probative of whether appellant committed the offense. Truthful persons tend not to lie. Peaceful persons do not attack others without adequate provocation.

Certainly, witnesses who knew the accused at different points in his life may offer pertinent character evidence that may assist the trier of fact. But all the evidence seeks to answer the same question: did the accused commit the offense. The probative value of character evidence therefore depends on its tendency to establish the accused's character *at the time of the offense*.[16]

---

[16] This borders on the tautological. For example, imagine a witness who would testify that the accused was an honest person from 1990-2000 but who no longer held that opinion after he viewed the accused as having fallen in with the wrong crowd. The witness's positive opinion regarding the accused's earlier honesty would not be relevant in determining whether the accused committed perjury in 2005.

Thus, when assessing whether a witness who will testify to the accused's character is cumulative, the timeframe that is ultimately critical is the time of the offense. Of course, witnesses who knew the accused in the past may offer admissible character evidence because it is a reasonable inference that an accused's character has not changed between the time the witness knew the accused and the time of the offense. Indeed, establishing that an accused's character has remained constant over a long period of time may assist the trier of fact in determining the strength of that inference. But, in the end, evidence of an accused's character trait is useful to the factfinder only to the extent that it assists the court-martial in determining whether the accused acted in conformity with that character at the time of the offense.

With that framework, we now turn to the question of whether the military judge erred when he denied the defense motion to compel the production of character witnesses.

Of the six witnesses identified in appellant's brief as having been improperly denied, only two were to provide admissible character evidence during findings. Major Tumpap is related to appellant's wife and had known appellant for ten years. Mr. Sokugawa had known appellant since 1995 and appellant claimed the witness "knew him better than anyone else." Both were to testify as to appellant's character of peacefulness and truthfulness.

The government denied the two witnesses as being cumulative with two other character witnesses that the government had already agreed to produce: 1LT Provost and Staff Sergeant Turgeon. These two witnesses were local, while the disputed witnesses would have to be flown in to testify.

First Lieutenant Provost testified to appellant's character at trial. By the time of trial, 1LT Provost had known appellant for about eleven months and had been appellant's acting company commander. Staff Sergeant Turgeon also testified to appellant's character. He had known appellant for about two and a half years and "hangs out" with appellant "every other day."

Although we find appellant's reliance on *Williams* mistaken, we share some concern with finding the witnesses cumulative. First Lieutenant Provost's opinion regarding appellant was based entirely on her post-offense interactions with accused. Staff Sergeant Turgeon knew appellant at the time of the offense, but not nearly as long as the two witnesses that the government had denied. Thus, while we see no per se right to call character witnesses from different points in appellant's life, it is arguable that, of the four character witnesses in question, the government, by

17

agreeing to produce the two local witnesses, provided the two witnesses who had a weaker foundation for their opinion.[17]

However, we must weigh our concerns against the backdrop of the standard of review. We review a military judge's ruling on a request for a witness for an abuse of discretion. *United States v. McElhaney*, 54 M.J. 120, 126 (C.A.A.F. 2000) (citing *United States v. Rockwood*, 52 M.J. 98, 104 (C.A.A.F. 1999)). "The decision on a request for a witness should only be reversed if, 'on the whole,' denial of the witness was improper." *Id.* (citing *United States v. Ruth*, 46 M.J. 1, 3 (C.A.A.F. 1997)). This court "will not set aside a judicial denial of a witness request 'unless [we have] a definite and firm conviction that the [trial court] committed a clear error of judgement in the conclusion it reached upon a weighing of the relevant factors.'" *Id.* (citing *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993)) (alterations in original).

The military judge did not explain his ruling denying the defense motion, and therefore receives less deference than he might otherwise have. However, while we note our concerns above, we lack a "definite and firm conviction that the trial court committed a clear error of judgment." We therefore do not find an abuse of discretion.

However, even if we were to find an abuse of discretion, we would not find the error to be prejudicial. Both MAJ Tumpap and Mr. Sokugawa testified for the defense, albeit telephonically. Major Tumpap laid a deep foundation for how he knew appellant and then said that in his opinion appellant was peaceful and that appellant "is a guy who will follow any laws around him wherever he's at." Mr. Sokugawa laid an even deeper foundation for his opinion and testified that appellant is peaceful and that appellant is law-abiding and "always follows the rules." Of course, that a witness testified telephonically does not always make the lack of in-person testimony harmless. Even more certainly, our finding of harmlessness should not be confused with sanctioning any error.

*C. Are Specialist Rine's notes regarding the assault a present sense impression?*

After Ms. LS collapsed and died, SPC Rine began taking notes on his phone recounting what had just transpired. He then continued to take notes as the police, coroner and other persons responded to the scene. The government offered SPC

---

[17] The government argues in their brief to this court that the panel heard "countless witnesses discuss appellant's character." The defense counters that the number of witnesses who testified in person, (which is the issue presented in the motion to compel production), is not "countless." Appellant responds that he "has no difficulty counting the number of witnesses who testified as to [appellant's] character in person. The number is two."

Rine's notes as a present sense impression during redirect testimony following defense counsel's cross examination of SPC Rine.

An exception to the rule prohibiting hearsay, a present sense impression is a "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it." Mil. R. Evid. 803(1). The crux of the issue here is whether SPC Rine's notes were taken "immediately after" the events he was describing.

Following defense counsel's cross examination, SPC Rine testified on redirect examination to the timing of the notes as follows:

> Q. Let me ask you: Did you document the things you saw?
>
> A. Yes, Sir.
>
> Q. Can you describe to the panel how you did that?
>
> A. Approximately 5 minutes after they were happening, after everything happened, I started taking notes on everything. And from there on out I took notes along with times and names of what had occurred and what was happening that moment.
>
> Q. So, you're contemporaneously taking notes in your cell phone?
>
> A. Yes, sir.
>
> Q. And that's roughly the same time as these events are happening?
>
> A. Yes, sir.
>
> Q. And did the things you write in that phone relate directly to the events that you were personally perceiving?
>
> A. Yes, sir.

During an Article 39(a) session the military judge then confirmed that SPC Rine took the notes "less than 5 minutes" after having observed what happened.

The question we must decide is whether "less than 5 minutes" is "immediately after" the events that were perceived for purposes of Mil. R. Evid. 803(1).

In *United States v. Brown* we noted that "[n]o military appellate court has defined 'immediately thereafter' beyond SALTZBURG'S suggested definition,[] 'as soon as the opportunity to speak arises.'" 48 M.J. 578, 583-84 (Army Ct. Crim. App. 1998) (citing SALTZBURG at 942 (4th ed. 1996)). While we noted that "periods of twelve hours up to two-and-a-half weeks have been rejected as untimely" we

could not find any case describing the other end of the permissible timeframe where a present sense impression could be used. *Id*. at 583-84 (citations omitted). Ultimately we did not answer the question in *Brown* because we found the government's foundation allowed for the statement to have been made "instantaneously or as much as four to eight hours after the perceived event." *Id.* at 584.

Today we attempt to provide some clarity on the question that went unanswered in *Brown.*

In *Taylor v. Erna*, Judge Woodlock summarized the law as to when a statement is contemporaneous with an event:

> There is no bright-line rule indicating what will constitute contemporaneity and courts have treated varying intervals of time alternatively admissible and inadmissible. *Compare United States v. Blakey*, 607 F.2d 779, 786 (7th Cir. 1979) (holding that 23 minutes between the event and the statement is within the scope of the "substantially contemporaneous" standard); *Miller v. Crown Amusements, Inc*., 821 F. Supp. 703 (S.D. Ga. 1993) (holding that 10 minutes between a traffic accident and declarant's explanation of the event in a phone call to the police is within the permissible scope of the contemporaneity standard) *with Hilyer v. Howat Concrete Co., Inc*., 578 F.2d 422, 426 n. 7, 188 U.S. App. D.C. 180 (D.C. Cir. 1978) (holding that 15 to 45 minutes after an accident was not within the scope of [t]he "substantially contemporaneous" standard and fell outside the present sense impression exception). The admissibility of statements depends on the facts of each case. *Blakey*, 607 F.2d at 785.

No. 08-10534-DPW, 2009 U.S. Dist. LEXIS 61612, at *14-15 (D. Mass. July 14, 2009). As Judge Woodlock further noted:

> The present sense impression exception "recognizes that in many, if not most, instances precise contemporaneity is not possible, and hence a slight lapse is allowable." Fed. R. Evid. 803(1) Advisory Committee's Note. The rationale is that the "substantial contemporaneity of the statement and the event described or explained offsets the likelihood of deliberate or conscious misrepresentation." [*United States v. Ferber*, 966 F. Supp. 90, 97 (D. Mass 1997)].

> The passage of a short interval of time should not preclude statements otherwise admissible under the exception.
> *Blakey*, 607 F.2d at 785.

*Id.* at \*15.  In *Taylor*, the evidence revealed that the statement was made between five and twenty minutes after the event in question.  Judge Woodlock concluded that "[w]hile fewer than five minutes seems clearly within the purview of the exception, twenty minutes is at the outer limit."  *Id.*

We agree with Judge Woodlock's reasoning.  While a proper determination will always turn on the facts of each individual case, we hold as a general matter, that five minutes will usually be within the present sense impression exception and twenty minutes is at the outer edge of the exception.

Our holding appears to be consistent with the vast majority of federal courts that have addressed the issue.  *See United States v. Green*, 556 F.3d 151, 157 (3d Cir. 2009) (fifty minutes is too long for a present sense impression); *United States v. Mitchell*, 145 F.3d 572 (3d Cir. 1998) (forty minute time span "probably too long for applicability of the present sense impression"); *United States v. Tutt*, No. 13-cr-20396, 2013 U.S. Dist. LEXIS 163290, at \*9 (E.D. Mich. Nov. 15, 2013) (statement "made within minutes" acceptable); *First State Bank of Denton v. Maryland Casualty Co*, 918 F.2d 38, 42 (5th Cir 1990) (statements made "on the heels" of the event was properly admitted); *United States v. Peacock*, 654 F.2d 339, 350 (5th Cir. 1981) (statements of deceased declarant when made with "substantial contemporaneity" with the event); *United States v. Davis*, 577 F.3d 660, 669 (6th Cir. 2009) (admitting 911 call where caller reported seeing defendant with a gun as present sense impression and stating it did not matter whether were made thirty seconds or five minutes after witnessing event); *United States v. Parker*, 936 F.2d 950, 954 (7th Cir. 1991) (present sense impression admissible when time period between event and declarant's statement was occupied by walking a short distance, being asked four or five questions, and then walking approximately 100 feet); *United States v. Mejia-Velez*, 855 F. Supp. 607, 623 (E.D.N.Y. 1994) (tapes of two 911 calls, one two to three minutes after shooting, the other approximately sixteen minutes after shooting, sufficiently contemporaneous with event and therefore admissible as present sense impression); *Torres v. City of Santa Clara*, No. 5:13-cv-01475-PSG, 2014 U.S. Dist. LEXIS 116195, at \*9 (N.D. Cal. Aug. 20, 2014) (an hour too long for a present sense impression); *Miller*, 821 F. Supp. at 707 (ten minutes not too long for a present sense impression); *Burrows v. General Motors Corp.*, No. 92-5771 1993 U.S. App. LEXIS 17673, at \*12 (6th Cir. 1993) (unpub.) (general discussion of present sense impression exception; statements held inadmissible because time of event could not be determined);

Given that the evidence presented to the military judge was that SPC Rine's notes were taken less than five minutes after the perceived events, that between observing the events and recording them SPC Rine was fully engaged in attempting

to care for one woman who was severely injured and another who was dying, we find that the military judge did not abuse his discretion in admitting the notes.

Accordingly, we do not address whether the notes were separately admissible as a prior recollection recorded or as a prior consistent statement.

## CONCLUSION

The findings of guilty and sentence are AFFIRMED.

Senior Judge MULLIGAN and Judge FEBBO concur.

FOR THE COURT:

JOHN P. TAITT
Chief Deputy Clerk of Court